**In re: UAL CORPORATION, et al., Debtors.**

**678**

Appeal of: Association of Flight
Attendants—CWA, AFL–
CIO.

No. 05–3200.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 2005.

Decided Nov. 1, 2005.

Robert S. Clayman (argued), Carmen R. Parcelli, Guerrieri, Edmond, Clayman & Bartos, Washington, DC, for Appellant.

Alexander Dimitrief (argued), Andrew A. Kassof, Kirkland & Ellis, Chicago, IL, for Appellee.

Jeffrey B. Cohen, Charles L. Finke, Shannon L. Novey (argued), Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC, for Intervenor–Appellee.

Before BAUER, MANION, and WILLIAMS, Circuit Judges.

MANION, Circuit Judge.

While in Chapter 11 bankruptcy, United Air Lines entered a settlement agreement with the Pension Benefit Guaranty Corporation concerning United's pension liabilities. Among its many provisions, the agreement called for PBGC to consider whether it, as the governmental insurer of failed pension plans, should terminate and then take over the pension plan of United's flight attendants, known as the Flight Attendant Plan. The affected union, the Association of Flight Attendants, objected to the agreement, but the bankruptcy court approved it. The district court affirmed.

AFA now appeals the approval to this court, and we affirm.

## I.

United Air Lines ("United")—along with its parent, UAL Corporation, and numerous affiliates—entered Chapter 11 bankruptcy in the Northern District of Illinois in 2002. A major impediment to United exiting bankruptcy is its pension liability, which totals about $4.5 billion for the next four years and of which some $624 million pertains to the Flight Attendant Plan (also "the plan"). United established the plan pursuant to a collective bargaining agreement ("CBA") with the Association of Flight Attendants ("AFA"). For many months, United and AFA negotiated in an attempt to amicably reduce United's pension liability while still preserving the plan. These efforts ultimately proved unsuccessful, and, on April 11, 2005, United filed a motion to reject the CBA under 11 U.S.C. § 1113(c) and to terminate the plan under 29 U.S.C. § 1341(c).

Section 1341 is part of Title IV of the Employee Retirement Income Security Act. Title IV provides the exclusive means for terminating single-employer pension plans, such as the plan here. *See* 29 U.S.C. § 1341(a)(1). Section 1341 enables a plan sponsor/employer to terminate its plan in two different situations. In a standard termination under § 1341(b), a plan is terminated with sufficient assets to cover all future benefit payments. By contrast, in a "distress termination" under § 1341(c), a plan is terminated without sufficient assets. Importantly, a § 1341 termination cannot override a collective bargaining agreement, *see* 29 U.S.C. § 1341(a)(3). Because of this restriction, United was obligated first to reject the CBA with AFA under § 1113(c) of the Bankruptcy Code.

When a plan is without sufficient assets and is terminated under Title IV, the Pension Benefit Guaranty Corporation ("PBGC") typically takes over as trustee and pays plan participants their existing pension benefits (up to statutory limits). *See* 29 U.S.C. §§ 1322 & 1361; *PBGC v. LTV Corp.*, 496 U.S. 633, 637–38, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). Once termination occurs, however, participants cannot earn additional benefits under their plan. *See LTV*, 496 U.S. at 638, 110 S.Ct. 2668. Paying pension benefits on behalf of failed plans is part of PBGC's mandate from Congress. *See* 29 U.S.C. § 1302(a). Currently, PBGC self-finances this mission through four sources of income: insurance premiums paid by current sponsors of active plans, assets from terminated plans taken over by PBGC, recoveries from former sponsors of terminated plans, and PBGC's own investments. Nevertheless, as PBGC is the governmental backstop for failed pension plans, a taxpayer bailout would be another source of funding if PBGC were otherwise unable to fulfill its mission. In fact, PBGC is already confronting a $23 billion deficit[1] and is currently paying pension benefits to one million individuals while also insuring the pensions of some forty-four million other individuals; thus, the specter of a future bailout looms.[2]

---

1. As a comparison, the Supreme Court noted back in 1990 that PBGC was facing a deficit of less than $2 billion. *See LTV*, 496 U.S. at 638, 110 S.Ct. 2668.

2. According to PBGC's most recent annual report (2004), PBGC currently "does not have sufficient resources to meet all of its long-term obligations," and PBGC is working on reforms so as to "continue to fulfill its vital mission of protecting pension benefits while avoiding a taxpayer bailout."

Accordingly, to help PBGC responsibly manage its future obligations for the good of the pension plan system as a whole, Congress gave PBGC an alternative to waiting for a plan to be terminated under § 1341(c). Through 29 U.S.C. § 1342, Congress authorized PBGC to terminate a failing plan so that PBGC could nip a plan's increasing losses and thereby reduce PBGC's exposure to mounting liabilities. *See* 29 U.S.C. § 1342(a)(4). Unlike § 1341 terminations initiated by the employer, PBGC can terminate a plan under § 1342 regardless of any provision in a union's collective bargaining agreement. *See LTV*, 496 U.S. at 639, 110 S.Ct. 2668. Further, consistent with the national outlook of its mission, PBGC need not consult with a union before a § 1342 termination. *See Jones & Laughlin Hourly Pension Plan v. LTV Corp.*, 824 F.2d 197, 199–202 (2d Cir.1987).

Given the concerns and responsibilities facing PBGC plus United's deteriorating financial situation, PBGC closely monitored the health of United's pension plans during the bankruptcy. While United's §§ 1113(c)/1341(c) motion was pending (the bankruptcy court had set a trial on the motion for May 11), PBGC and United reached a settlement agreement on April 22, resolving several complex liability and collection disputes concerning United's future obligations to PBGC for United's failed and failing pension plans. For instance, the agreement gives PBGC a single unsecured claim for United's unfunded pension liabilities against United's bankruptcy estate, as opposed to a myriad of joint-and-several claims against numerous United affiliates. Additionally, to help fund PBGC's mission, the agreement also provides for PBGC to receive $1.5 billion in securities in United's reorganization plan. PBGC could have possibly recovered a greater amount if it elected to fully (and expensively) litigate each of its claims against United and its affiliates. PBGC formed this agreement pursuant to 29 U.S.C. § 1367, which enables PBGC to seize opportunities to avoid inefficient litigation and to increase the certainty of its recoveries. Specifically, Congress empowered PBGC in § 1367 to enter "arrangements" with entities, like United, "who are or may become liable" to PBGC through a § 1341(c) or § 1342 termination. *See* 29 U.S.C. §§ 1362(a) & 1367; *Allied Pilots Ass'n v. PBGC*, 334 F.3d 93, 98 (D.C.Cir. 2003).

Important to this appeal, the settlement agreement also called for PBGC to begin its administrative process of evaluating whether it could or should terminate the Flight Attendant Plan under § 1342. To be clear, the agreement did not require PBGC to terminate the plan. PBGC was to consider "if" a § 1342 termination was appropriate. The termination was not preordained.

On April 26, United submitted the agreement to the bankruptcy court for review under 11 U.S.C. § 363. On May 10, the bankruptcy court held a hearing on the agreement, giving AFA and others the opportunity to object. AFA contended that United violated its collective bargaining responsibilities by entering the agreement and therefore asked the bankruptcy court to reject the agreement. The bankruptcy court disagreed and, at the conclusion of the hearing, approved the agreement. United then withdrew its §§ 1113(c)/1341(c) motion to await PBGC's decision on the possibility of a § 1342 termination.

Thereafter, AFA took two separate steps to challenge the agreement. On May 18, AFA appealed the bankruptcy court's approval to the United States District Court for the Northern District of Illinois. *See* 28 U.S.C. § 158(a). Also, on

May 20, AFA sued PBGC under 29 U.S.C. § 1303(f) in the United States District Court for the District of Columbia, attempting to enjoin the PBGC evaluation process called for in the agreement. Section 1303(f) affords entities adversely affected by PBGC action a cause of action to seek "appropriate equitable relief" against PBGC. The United States District Court for the District of Columbia denied AFA a preliminary injunction on June 8, and proceedings in that case are continuing.

On June 23, after reviewing an extensive administrative record on the Flight Attendant Plan, PBGC completed its evaluation process under § 1342(a),[3] finding that a termination of the plan was in the best interest of the pension plan system as a whole. PBGC took over the plan as the trustee, and the termination became effective on June 30. The termination prompted AFA to amend its § 1303(f) complaint to ask the United States District Court for the District of Columbia to order PBGC to restore the plan under 29 U.S.C. § 1347 or, at a minimum, to enjoin PBGC from proceeding with the termination.

In this case, on July 21, the United States District Court for the Northern District of Illinois affirmed the bankruptcy court's approval of the settlement agreement. On July 25, AFA appealed to this court, and we granted AFA's request for an expedited appeal.

## II.

Before discussing the parties' appellate arguments, we briefly clarify our jurisdiction. It is well settled that, under Article III, "federal courts may not give opinions upon moot questions or abstract propositions." *Worldwide St. Preachers' Fellowship v. Peterson,* 388 F.3d 555, 558 (7th Cir.2004) (internal quotations omitted). Here, despite the pendency of the § 1303(f) action before the United States District Court for the District of Columbia and the fact that PBGC has already terminated the plan, we do have a justiciable controversy. The § 1303(f) action is a dispute between AFA and PBGC about the § 1342 termination. Our case involves a dispute between AFA and United about the settlement agreement. While the disputes are related, the parties and issues make the cases distinct. In short, the resolution of the § 1303 action will not resolve or moot AFA's objective in this appeal: overturning the entire settlement agreement.[4] Satisfied that we have a live case to adjudicate, we turn to the merits.

In seeking to reverse the bankruptcy court's order approving the United–PBGC settlement agreement, AFA raises three main arguments. Our review of the legal issues presented is de novo, and we assess the bankruptcy court's decision

---

**3.** Section 1342(a) provides, in pertinent part: "[PBGC] may institute proceedings under [§ 1342] to terminate a plan whenever it determines that—(1) the plan has not met the minimum funding standard required under [26 U.S.C. § 412], or has been notified by the Secretary of the Treasury that a notice of deficiency under [26 U.S.C. § 6212] has been mailed with respect to the tax imposed under [26 U.S.C. § 4971(a)], (2) the plan will be unable to pay benefits when due, (3) the reportable event described in [29 U.S.C. § 1343(c)(7)] has occurred, or (4) the possible long-run loss of the corporation with re-

spect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated."

**4.** Which is a possible result since, as we learned at oral argument, the parties' duties under the settlement agreement have yet to be fully performed and since the agreement contains a non-severability clause stating: "Should any provision of this Agreement be held unenforceable or contrary to law, the entire Agreement shall be deemed null and void."

anew. *See In re Midway Airlines, Inc.,* 383 F.3d 663, 668 (7th Cir.2004); *In re Kmart Corp.,* 381 F.3d 709, 712 (7th Cir. 2004).

■ AFA first argues that the bankruptcy court erred in approving the settlement agreement because a party to the settled litigation was not party to the settlement agreement. *See Fogel v. Zell,* 221 F.3d 955, 964 (7th Cir.2000). According to AFA, its exclusion from the United–PBGC agreement should have caused the bankruptcy court to reject the agreement. AFA, however, misapprehends the nature of what the agreement settled. The agreement, as summarized above, settled matters between United and PBGC. The agreement did not settle, as AFA would have it, United's §§ 1113(c)/1341(c) motion against AFA. United withdrew that motion. Consequently, whether United can reject its CBA with AFA under § 1113(c) and thereby terminate the Flight Attendant Plan under § 1341(c) is an unresolved question, not a settled one. The agreement, moreover, did not terminate the plan. It simply provided for PBGC to initiate a review to determine whether PBGC should terminate the plan under § 1342—an administrative process that is wholly separate from § 1341(c) and unrestrained by the terms of collective bargaining agreements. *See LTV,* 496 U.S. at 639, 110 S.Ct. 2668. Accordingly, the bankruptcy court's approval of the agreement did not impermissibly settle litigation to which AFA was a party.

■ Next, AFA contends that the bankruptcy court should not have approved the agreement because United, by entering the agreement, trampled over the collective bargaining framework established by §§ 1113/1341 and, more generally, the Railway Labor Act, which governs relations between United and AFA. However, Title IV provides an alternative to that framework. Again, under § 1342, PBGC can terminate a plan irrespective of a particular collective bargaining agreement, *see id.,* and further, through § 1367, Congress has authorized settlement arrangements between PBGC and those who may become liable to PBGC as the result of a termination, *see Allied Pilots,* 334 F.3d at 98. Despite AFA's protestations, the path taken by United and PBGC was entirely appropriate. Congress has not prohibited sponsors from pursuing a § 1341(c) termination while simultaneously petitioning PBGC for a § 1342 termination, *cf. LTV,* 496 U.S. at 640, 110 S.Ct. 2668 (employer sought to have PBGC terminate plans under § 1342), or, as here, pursuing § 1367 negotiations with PBGC that lead to PBGC considering if it should terminate a plan under § 1342. As such, AFA's true complaint here is not with United, PBGC, or the courts but with Congress and §§ 1342 and 1367.

Moreover, the permissibility of the agreement under Title IV puts to rest the collective bargaining arguments raised by AFA. Contrary to AFA's contentions, United, through its actions detailed above, did not unilaterally modify the CBA, nullify judicial review, nor violate its duties to bargain in good faith with the exclusive representative of its flight attendants over terms and conditions of their employment. United did not, as AFA suggests, bargain with PBGC as if PBGC was a labor representative of United's flight attendants, and United did not establish an agreement to rival the CBA. Furthermore, while it is certainly true that a § 1341 process must adhere to the terms of a governing collective bargaining agreement, United did not impose a § 1341 result upon AFA here. Once again, United did not terminate the plan. The settlement agreement only called for PBGC to evaluate whether a § 1342 termination was appropriate and,

at the time of the agreement, PBGC's termination of the plan was not a sure thing. Simply stated, there was no pretext. All indications are that, had PBGC ultimately decided not to terminate the plan, United would have then refiled its motion and restarted the §§ 1113(c)/1341(c) process. By declining to pursue its §§ 1113(c)/1341(c) options once its § 1367 negotiations with PBGC raised the possibility of a § 1342 termination, United did not violate any duty owed to AFA.

▮ Finally, AFA contests a provision of the settlement agreement that sets a five-year moratorium on United establishing new plans from the date that it exits bankruptcy (a date still to be determined). This last point requires some additional background. When PBGC takes a failed plan off an employer's hands, PBGC generally does not want the employer and a union to turn around and immediately create a new, "follow-on" plan.[5] PBGC therefore works to prevent the premature creation of new plans in order to protect itself and its mission. See LTV, 496 U.S. at 651, 110 S.Ct. 2668 (PBGC's anti-follow-on policy helps avoid increased PBGC liabilities). That is why PBGC included the moratorium in its § 1367 agreement with United. While the end date for the moratorium is still to be determined, it will, under the current terms of the agreement, be no sooner than the fall of 2010. The CBA, on the other hand, currently becomes amendable on January 7, 2010. As of that amendable date, United and AFA could, theoretically, start a new pension plan under a renegotiated CBA. AFA complains that United, by assenting to the moratorium, has impermissibly modified the CBA. Not so. The CBA does not call for a new plan to be established within what is now the moratorium period. It is all a matter for future negotiations. At this juncture, AFA's complaint is entirely speculative.

## III.

Having reviewed AFA's arguments, we see no reason to disturb the bankruptcy court's approval of the United–PBGC settlement agreement. Pursuing § 1367 negotiations and thereby having PBGC consider terminating a plan under § 1342 is a permissible alternative to the §§ 1113(c)/1341(c) termination process. United simply followed this available alternative, and AFA's complaints about United's actions do not merit reversal. It should also be noted that AFA will have its day in court. By enacting § 1303(f), Congress has provided an avenue for challenging PBGC action, and AFA has taken full advantage of that § 1303(f) opportunity through its lawsuit against PBGC. As indicated above, proceedings in that case, before the United States District Court for the District of Columbia, are continuing. The judgment is AFFIRMED.

---

5. "[The PBGC] defines a follow-on plan as a new benefit arrangement designed to wrap around the insurance benefits provided by the PBGC in such a way as to provide both retirees and active participants substantially the same benefits as they would have received had no termination occurred. The PBGC's policy against follow-on plans stems from the agency's belief that such plans are 'abusive' of the insurance program and result in the PBGC's subsidizing an employer's ongoing pension program in a way not contemplated by Title IV." LTV, 496 U.S. at 642, 110 S.Ct. 2668.